UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| GREGG WADE and KARIN WADE,<br>    Plaintiffs<br><br>*v.*<br><br>THOMAS CLAYTON and TOUCHDOWN<br>REALTY GROUP, LLC,<br>    Defendants/Third-Party Plaintiffs<br><br>*v.*<br><br>COMMONWEALTH REALTY GROUP,<br>LLC d/b/a CENTURY 21 and LISA<br>PAULETTE,<br>    Third-Party Defendants | CIVIL ACTION NO.:  1:17-CV-10400-PBS |

**MEMORANDUM OF LAW IN OPPOSITION OF PLAINTIFFS KARIN AND GREGG
WADE TO THE MOTION FOR SUMMARY JUDGEMENT OF THOMAS CLAYTON
AND TOUCHDOWN REALTY GROUP, LLC PURSUANT TO F.R.C.P. 56(c)**

The Plaintiffs, Karin and Gregg Wade ("the Wades"), request that this Honorable Court

deny the Motion for Summary Judgment of Defendants Thomas Clayton and Touchdown Realty

Group, LLC, as the case contains a substantial number of facts in dispute which require

deliberation by the jury and the Defendants have failed to identify any count within the Amended

Complaint which warrants a granting of their motion. As grounds for this Opposition, the Wades

state as follows.

     I.      <u>SUMMATION OF OPPOSITION</u>

        ***"Everything about this house concerns me"***

So said Thomas P. Wrynn, the Building Inspector of the town of Foxboro, referring to the

house at 32 Oak Street in Foxboro which was sold to the Wades by Touchdown Realty Group,

LLC, with Tom Clayton as Touchdown's broker.[1] In its broadest sense, the lawsuit brought by the Wades alleges that the Defendants, collectively, fraudulently palmed off a two bedroom death trap as a three bedroom house that was code compliant. The term "death trap" is not used lightly. As was noted by Dennis Schadler of D & D Home Improvements, Inc., a registered Home Improvement Contractor and Construction Supervisor who was retained by the Wades to make alterations to the lower level third bedroom and bathroom for the Wade's severely disabled daughter, he removed wallboard and discovered defective wiring, a lack of fire stops, defective framing and a defective secondary egress, all of which are violations of state building code. As Mr. Schadler noted in his Affidavit, the combination of a source of ignition, when coupled with an absence of means to contain the spread of flame, when accompanied by insufficient framing to delay collapse of a burning house, which also had a defective secondary egress, "would quickly burst in to a fireball." [2]

This is a lawsuit arising out of fraud, fraud by omission, fraud by misstatement and fraud by action. While the dry legal environment requires that Karin and Gregg Wade by referred to as plaintiffs, the harsh reality is that the more appropriate description would and should be "victims." Who are the Wades? The Wades are the parents of Estelle (10 years old) and Samuel (7 years old). The family moved to New England from Michigan for a job opportunity for Gregg Wade, who works in the logistics industry. Estelle Wade has been diagnosed with spastic quadriplegic cerebral palsy, refractory epilepsy, scoliosis and a number of other conditions. She also suffers from cortical visual impairment and is legally blind. She is non-ambulatory and non-verbal, and requires 24/7 care with bathing, teeth brushing, hair brushing, toileting, feeding, diaper changing, positioning and dressing. She also requires special food preparation, and special

---

[1] Exhibit B, page 29, line 14. He continued, "no permits were pulled. We didn't get to look at anything."
[2] Exhibit M, ¶ 8

facilities within the house to accommodate her wheelchair and access to an adapted van. Karin Wade, who was employed prior to the arrival of Estelle, is now Estelle's primary caregiver, and her daily care begins at about 4:30 in the morning. In addition to the daily care, Estelle has required a number of complex and difficult surgeries, which adds travel and transportation, not to mention additional stress on the family and family finances. Thus, when the Wades found that 32 Oak Street had a lower level bedroom with a bathroom across the hall, all of which could be retrofitted using a combination of their finances as well as public grants, and based upon Thomas Clayton's statement that the house was "grandfathered-in" and that the room on the first floor with a door was the third bedroom, they relied upon his words, and had every legal right to do so. Considering that they now live in a house with a severely disabled daughter and with drained finances in a manner which is in conflict with local and ordinances and health codes, the Wades find themselves in a circumstance in which, if this transaction is not rescinded, they are going to have to move out of that house with all of Estelle's other issues and, frankly, there is no plan of how that will happen. In the dry world of law, they absolutely relied on Thomas Clayton's word as the person best informed about this house in terms of its material condition, and they have been harmed in ways that most people simply cannot identify with or imagine. But the jury should and will get that chance to punish Thomas Clayton. At trial, the jury will see a video of the day in the life of Karin and Gregg Wade, which is an astonishing and never ending succession of exhausting care. The jury will be shown the house, so that they can understand the materiality of a lower level bedroom. The jury will have the opportunity to consider the implications of defective wiring, a lack of fire stops, a lack of structural integrity and a lack of egresses in a house with a severely disabled, non-mobile, legally blind child alone downstairs.

And the jury should get the chance to make all this right and punish Thomas Clayton for his conduct by finding that his conduct was unfair and deceptive in its plainest meaning.

Contrary to the Defendants' contentions, this is not a case in which the Defendants were truthful but ambiguous, nor is it a case in which the Defendants simply failed to fix existing problems. A substantial body of evidence creates sufficient inferences for a jury to determine that the Defendants *created* the defects and *concealed* them, in violation of contractual *and* statutory duties as well as the realty brokerage industry standards. Equally, Tom Clayton specifically lied to Lisa Paulette, the Wades' broker, to induce the Wades to purchase the house. Finally, the Wades contend that Touchdown and Clayton are alter egos of each other, such that Clayton is liable for the acts of Touchdown, and that both parties are liable under GL c. 93A warranting the awarding of treble damages and attorney's fees.

The Wades apologize in advance for the voluminous record appended to this Opposition, simply noting that much of this case reflects an absence of documents, not a surfeit of documents. Thus, the record must be complete so that the absence of certain records, the negative as it were, stands in sharp relief. The Wades have appended seven "chalks" which resemble that which a jury will view at trial, all drawn from the record, permitting both this Court and the ultimate jury to see the relevant portions side by side, while still being available in context. Finally, the Wades append a timeline to aid the Court in processing the record.[3]

## II.   RELEVANT FACTS

The Defendants have provided 37 "Undisputed Material Facts." To the extent that paragraphs 1-17 simply incorporate statement from existing documents and testimony, the Wades do not contest those facts.

---

[3] The Wades agree that Massachusetts law guides this case, and believes there is no reason to discuss that issue further. Equally, the Wades are confident that the Court understands the standard of F.R.C.P. 56(c) and sees no need to repeat that standard here.

Paragraph 18, however, is false. Chalk 1 and Chalk 2 demonstrate the falsity of the statement. Contained in Chalk 1 is a copy of document from the town of Foxboro and was verified by Pauline E. Zajdel, Health Director, Exhibit A, Page 120, Exhibit 20. The first document in the chain is an email request by Tom Clayton that the town should "keep the house as a 3 bedroom (grandfathered in)"  Pauline Zajdel wrote "no grandfathering." On page 121, Zajdel testified that grandfathering means that "anything that they had before can be grandfathered in currently."  She also testified that she made it clear to Clayton that there would be no grandfathering. The second document is Defendants' Exhibit 18, the email of July 21, 2016 to Lisa Paulette from Clayton, in which, two months after being told there would be no "grandfathering," Clayton told Paulette that it was "grandfathered in." See, also, Affidavit of Rubinstein, Exhibit K, ¶¶ 2-3.  Thus, not only is the statement not "factually accurate," it is a bald faced lie. See also, Chalk 2 and Affidavit of Rubinstein,  for 13 "factually accurate" statements that could have been made, in contrast to what Clayton said.

The Wades have no objection to the statements 19-28, to the extent that these statements are drawn from documents and testimony. The Wades contest, as is stated below, that these paragraphs are proof of successful fraud, not statements which are exculpatory. As to paragraphs 29-37, the Wades equally argue that these statements support the Wades' legal argument below and do not provide any exculpatory defense to Clayton or Touchdown.

The Wades tender the following Material Facts not in Dispute:

1. On or about May 9, 2016, Tom Clayton requested that the downstairs third bedroom be "grandfathered in." Exhibit A,  Depo Exhibit 20 (See, also, Chalk 1)

2. On or about May 9, 2016, Tom Clayton was told by Pauline Zajdel that there would be "no grandfathering." Exhibit A, Depo Exhibit 20 (See, also, Chalk 1)

3. On July 21, 2016, Tom Clayton, in response to a direct question by Paulette to clarify the 2-3 bedroom inconsistency, was told that the house was "grandfathered in."  Defendants' Exhibit 18. (See, also, Chalk 1)

4. Prior to April 21, 2016, Pauline Zajdel found Clayton gutting 32 Oak Street, "we couldn't do a bedroom count because everything was gutted down below and upstairs." Exhibit A, page 19. (See, Also, Chalk 3)

5. Prior to April 21, 2016, Pauline Zajdel noted that "there were no bedrooms to count. There were no rooms there. Everything was studded, no walls." Exhibit A, Page 20

6. Pauline Zajdel sent a letter to Clayton on April 21, 2016 telling him that "as discussed this office/den area can't have a door on it." Defendants' Exhibit 12 (See, Also, Chalk 3)

7. When Dennis Schadler went to the house after closing, he observed a door on the downstairs bedroom. Exhibit E, Deposition of Dennis Schadler, Page 30 (See, Also, Chalk 3)(See, also, Defendants' Exhibit 22, the appraisal, in which the appraiser also identified the den as the third bedroom, and the doorknob on the door is visible at the far right side of the photo.)

8. Touchdown Realty and the Wades signed a Repair Agreement-Exhibit H (See, Also, Chalk 4)

9. The Repair Agreement stated that Touchdown Realty would make four minor repairs to electrical work. Exhibit H. (See, Also, Chalk 4)

10. Amongst other things, Wilkinson replaced 30 lights, 50 receptacles, 20 switches, one range, one dishwasher, one dryer. Exhibit B, Deposition of Wrynn, page 45 (See, Also, Chalk 4)

11. Wilkinson only fixed that which could be easily accessed, so he was not able to ascertain what the hidden electrical components resembled. He had no confidence that the wiring he did not fix "was done properly." Exhibit D, pages 139-140 (See, Also, Chalk 4)

12. Paragraph 10 of the Purchase and Sale Agreement, ¶ 10, states that possession is to be delivered "at the time of Closing…(d) not in violation of said building and zoning codes." Defendants' Exhibit 21. (See, Also, Chalk 5)

13. Paragraph A5 to Addendum A to the Purchase and Sale Agreement states that "SELLERS have not received any notice that the property violates any municipal, state or federal law, rule, regulation or ordinance." Defendants' Exhibit 21 (See, Also, Chalk 5)

14. Paragraph 7D to Addendum B to the Purchase and Sale Agreement states that "there is, to the best of the Seller's knowledge and belief, no action, suit, order, decree, claim, writ, injunction or judgment relating to material violations of any laws, ordinances, codes, regulations or other requirements with respect to the premises in, or by any court or governmental authority having jurisdiction over the premises." Defendants' Exhibit 21 (See, Also, Chalk 5).

15. On or about August 15, 2016, Tom Clayton received a notice of violation of building code from Thomas Wrynn, Building Inspector, See, Exhibit F, Deposition of Clayton, Exhibit 20.(See, Also, Chalk 5)

16. Thomas Clayton received the August 15, 2016 letter. See, Exhibit F, page 39.

17. When Dennis Schadler opened the walls after closing, he found "improper construction, insulation, electrical, plumbing, firestopping & other items…" Exhibit E, Deposition Exhibit 30. See, also, Exhibit E, Deposition Exhibits 9-24, photographs showing deficiencies, and corresponding testimony. (See, Also, Chalk 5)

18. The Repair Agreement, Exhibit H, required that Touchdown would "obtain[] all closed work permits issued by the Town of Foxboro, Massachusetts for recent renovations made after April 2016." (See, Also, Chalk 5)

19. The work performed after April of 2016 was not properly permitted or inspected by the town of Foxboro. Wrynn Deposition, Exhibit B, page 29, line 14. "no permits were pulled. We didn't get to look at anything."

20. According to Julian Lewis, Touchdown's General Contractor, the scope of work was "just to renovate the existing structure and bring it up to code." Deposition of Julian Lewis, Exhibit C, page 45.

21. Julian Lewis could not identify an interior designer, engineer, stamped drawings, stamped plans or specifications. Exhibit C, page 32-33.

22. Julian Lewis, the General Contractor, had no subcontractors, could not recall who the subcontractors were, and had no subcontractor meetings. Exhibit C, page 49-50

23. Julian Lewis could not recall if there were inspections for the project. Exhibit C, page 49-50

24. Julian Lewis could not recall if he was paid for his role as General Contractor Exhibit C, page 59

25. Exhibit 1 to the Deposition of Clayton, Exhibit F, contains the Response to the Request for Production of Documents tendered to Touchdown dated on or about July 17, 2017.

26. Request 3 to Exhibit 1 sought a series of documents in subparagraphs a-o, with all but j,k, m and o referencing a request for construction documents. See, Exhibit F, Exhibit 1

27. Exhibit 12 to Exhibit F consists of Touchdown's production as to Request 1,2,3,4,5,6, 12 and 17.

28. The response to Request 1,2,3,4,5,6, 12 and 17 consisted of 9 pages, none of which is a construction document. Exhibit F, Deposition Exhibit 12

29. Touchdown had no documents responsive to Request 4 or Request 5. Exhibit F, Deposition Exhibit 12

30. Tom Clayton has never seen an accounting of the project and can't identify the "amount spent on this renovation." Exhibit F, page 63

31. Thomas Clayton was not receiving compensation for his work for Touchdown. See, Exhibit G, Page 85. Deposition of Kelly Clayton. (Thomas Clayton was given "just my love.")

32. Exhibit J consists of a Request for Production of Documents tendered to Tom Clayton, which was responded to on or about July 17, 2017. Exhibit J

33. Exhibit J sought the same documents in Request 3 from Clayton as had been sought from Touchdown.  See, Exhibit J.

34. Exhibit J contains the documents that were provided by Clayton. Exhibit J

35. Exhibit J contains no construction documents, and provides the same documents, or lack thereto, as the response from Touchdown.

36. Andrew Rubenstein, who was closing counsel for the Wades, was not notified of the August 15, 2016 letter from the town of Foxboro Building Inspector by Touchdown or Clayton. Exhibit K ¶ 7

37. Andrew Rubenstein, who was closing counsel for the Wades, was not notified of the expansive electrical work that was required after the signing of the Repair Agreement Exhibit K ¶ 6

38. Andrew Rubenstein, who was closing counsel for the Wades, was not notified of the placement of the downstairs door in violation of Pauline Zajdel's Order. Agreement Exhibit K ¶ 8

39. Andrew Rubenstein, who was closing counsel for the Wades, did not find it preposterous that the house could be "grandfathered in" and was not notified of the placement of the downstairs door in violation of Pauline Zajdel's Order. Agreement Exhibit K ¶¶ 2,10

40. Andrew Rubenstein, who was closing counsel for the Wades, relied upon the statements of Tom Clayton, as broker with actual knowledge, in advising the Wades with regards to this transaction.

41. Defendants' Exhibit 1, records from the Secretary of State's Office in the state of Rhode Island, identifies the corporate office of Touchdown Realty Group, LLC as 12 E Cottage Road in Smithfield, Rhode Island and a prior address at One New Road in Rumsford, RI.

42. The address of record for the town of Foxboro Building Department as of August 15, 2016, for Tom Clayton, was 1 New Road in Rumford, RI. Deposition Exhibit 20 to Clayton, Exhibit F.

43. Tom Clayton moved from 1 New Road in Rumford to 12 E. Cottage Street in Smithfield, a property which is a single-family home. Exhibit F, Deposition of Clayton, Page 7.

44. Clayton and Touchdown Realty Group share a common address at 12 E. Cottage Street in Smithfield. (Exhibit F, Page 7 and Defendants' Exhibit 1)

45.  The Wades sent their 93A demand letters in this case to Tom Clayton at One New Road in Rumford and to Touchdown Realty Group at 12 E. Cottage Street in Smithfield. (Exhibit L)

46. The address in Smithfield in Exhibit L is the same as the address for Touchdown Realty Group and Tom Clayton as identified in Exhibit 1 and Exhibit F, page 7).

III <u>ARGUMENT</u>

A.  THE DEFENDANTS HAVE FAILED TO DEMONSTRATE AN ENTITLEMENT TO SUMMARYJUDGMENT AS TO COUNTS I AND II OF THE AMENDED COMPLAINT

### *The Premises…is to be delivered at the time of closing…not in violation*

So said the Purchase and Sale Agreement, which the Defendants proceeded to breach.

Counts I and II are contractual remedies arising out of Touchdown's breach of the Purchase and Sale Agreement, the first based on willful breach of contractual terms (Count I) and the other based upon the covenant of good faith and fair dealing. (Count II). In <u>Massachusetts Municipal Wholesale Electric Company v town of Danvers,</u> 411, Mass. 39, 58 (1991), it was noted that a claim for breach of contract only accrues when there is a "failure to perform a legal or contractual duty…" within the written contract.

In this case, the Wades contend that Touchdown violated Paragraph 10 of the Purchase and Sale Agreement, ¶ 10, that possession is to be delivered "at the time of Closing…(d) not in violation of said building and zoning codes,"as well as Paragraph A5 to Addendum A to the Purchase and Sale Agreement that "SELLERS have not received any notice that the property violates any municipal, state or federal law, rule, regulation or ordinance." and Paragraph 7D to Addendum B to the Purchase and Sale Agreement which states that "there is, to the best of the Seller's knowledge and belief, no action, suit, order, decree, claim, writ, injunction or judgment relating to material violations of any laws, ordinances, codes, regulations or other requirements with respect to the premises in, or by any court or governmental authority having jurisdiction over the premises."  Equally, Touchdown was bound by the Repair Agreement requiring that

Touchdown would "obtain[] all closed work permits issued by the Town of Foxboro, Massachusetts for recent renovations made after April 2016." Clearly, this was a promise to bring the project to full and final completion. As Julian Lewis, the General Contractor testified, that included bringing the project up to code.

There are clear breaches of contract for the jury to consider.

Dennis Schadler has stated that he found substantial code violations when he opened the walls, representing work that had been done since April of 2016. That the work was deficient is really beyond question—Wilkinson, the electrician, was essentially required to rip out and replace all new work. Even the building inspector noted that "no permits were pulled. We didn't get to look at anything." The Health Director confirmed that the house had been gutted during Touchdown's ownership. Equally, the Building Inspector sent a violations notice in August of 2016 that the property was in violation. Of equal import, Touchdown installed a door on the lower level bedroom and advertised the house a three bedroom house, after specifically being told that this could not be done.

In short, due to the merging of broker and owner, Touchdown not only sold a non-compliant house, but they rendered it non-compliant during the renovation and sale process, and lied to Lisa Paulette, and apparently the town, as to what was transpiring.

There is certainly a substantive record that Touchdown breached the Repair Agreement by not bringing the project to proper compliance. There is certainly a factual record that Touchdown installed code deficient and dangerous work. There is a factual record that Touchdown knowingly conveyed a property that did not comply with either building or zoning requirements, regardless of a covenant to do so. The breach of implied covenants of good faith and fair dealing is certainly factually evident.

There is much for the jury to sift through and consider, such that the Motion for Summary Judgment as to Count I and Count II must be DENIED.

B.  THE DEFENDANTS HAVE FAILED TO DEMONSTRATE AN ENTITLEMENT TO SUMMARY JUDGMENT AS TO COUNT III OF THE AMENDED COMPLAINT

*"I'll gladly explain!"*

So said Tom Clayton in his email to Lisa Paulette on July 21, 2016, Defendants' Exhibit 18, after a clearly confused Paulette asked him to "explain the 2 bedroom septic system for a 3 bedroom house." And having proceeded to agree to "gladly explain," Clayton proceeded to lie to Paulette to induce the Wades to make an offer to buy 32 Oak.

Count III of the Amended Complaint seeks remedies for Fraud/Intentional Inducement, which provides for the remedy of undoing this transaction.

As with any tort, the primary element is "duty." Duty as it relates in this context is to one particular regulation and one particular case. The regulation is 940 CMR 3:16 (2), promulgated under the Consumer Protection Statute of G.L. c. 93A, and states that "an act or practice is a violation of M.G.L. c. 93A §2 if…any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer not to enter into the transaction…"

The key case on point is <u>Zimmerman v. Kent</u>, 31 Mass.App.Ct. 72,78 (1991), a misrepresentation case in the context of a residential real estate deal, and which ultimately resulted in the remedy of rescission and damages, the same remedy sought here.  As the Court noted there, "the first requirement to sustain a claim of misrepresentation is that the representation must be false."  The next element is one of "materiality" and it must be "one of fact…" There must be "reliance." Also, "under Massachusetts law plaintiffs need not prove that the speaker knew his statement to be false." <u>Zimmerman</u>, 31 Mass.App.Ct. at 81. The final

element is that "the statement relied upon must not be preposterous or palpably false…"  Of equal import, when a claim is not preposterous or palpably false, there is no duty of the party relying on the misrepresentation to conduct an independent investigation into the statement.

Turning to the facts, there is no doubt that the Defendants are not entitled to summary judgment on this count. Looking at the Defendants' own statement of material facts, ¶¶ 5,10,14,15 and others, there was some degree of confusion as to the bedroom count. Paragraph 12 of the Defendants' own Statement confirms that it was material to the Wades that the house be a 3 bedroom. So Lisa Paulette asked Tom Clayton, who was broker and owner, to explain the 2 and 3 bedroom discrepancy. Two things are notable about Clayton's response. First, he simply lied about the grandfathering provision, see Chalk 1. Also, he was able to say that "the house is obviously a 3 bed dwelling" because he made it one in specific violation of the orders of the town of Foxboro. See Chalk 3. After being told he couldn't put a door downstairs, he did so, and then remarked that the house was obviously a 3 bed dwelling. In fact, Clayton was aware of the untruths when the Purchase and Sale Agreement was signed, meaning that he engaged in fraud both prior to the Offer, and after. While Zimmerman states that there is no need to prove that the party knew the statement was false, this case presents a clear example of how that proof would appear.[4]

Chalk 2 points out, as the jury will be invited to consider, how easy it would have been for Clayton to tell the truth. There are certainly other acts of concealment here—hiding the lack of permits and inspections, not disclosing the scope of electrical repair and so on, putting up walls to hide code defects, but the Court need not go that far to defeat the Motion for Summary Judgment.

---

[4] See, also, Exhibit I, deposition of Ken Sears, an expert witness whose opinion was not contested by a countervailing expert, Exhibit 18, page 10-11, that not only did Clayton violate the Zimmerman standard and state regulations, but also that he violated industry standards in disclosing known information to Lisa Paulette.

Was the representation false? Absolutely. Was the response material? The Defendants in ¶12 seem to stipulate to materiality. Was the false statement one of fact? In stating that the property was grandfathered in, Clayton was telling Lisa Paulette that the house could be used as a 3 bed dwell, hence his 3 bed dwell listing, when he knew it could not. Did the Wades rely upon the statement? Defendants' Exhibit 20, the Offer, confirms they did. Was the statement preposterous? Andrew Rubenstein, the Wades' lawyer say no in Exhibit K. In fact, a jury could construe Clayton's question to the Health Director, Chalk 1, for grandfathering, that he did not consider the concept as preposterous either. The time line attached here as a chalk shows that Thomas Clayton had the final word, as the broker, as to what the status of the property was, and he failed to disclose honestly and fully. Regardless, the factual record shows that Clayton, as broker, had material information to disclose and that he had a duty to do so, and he not only failed to disclose what he knew, but he actively violated town orders to facilitate his untruths and half-truths. As a result of a material false statement, which was reasonably relied upon, the Wades were damaged, such that the Defendants' have failed to demonstrate an entitlement to summary judgment on Count III, which must be DENIED.

    C.  THE DEFENDANTS HAVE FAILED TO DEMONSTRATE AN ENTITLEMENT TO SUMMARY JUDGMENT AS TO COUNT IV OF THE AMENDED COMPLAINT

*"it was just Tom"*

So said Pauline Zajdel, Exhibit A, page 21, in what could be the theme of this entire lawsuit. Zajdel was asked if "she ever…[had]…any communication with anyone other than Mr. Tom Clayton with respect to the 32 Oak Street property," having denied ever speaking to Kelly Clayton, who supposedly owns and runs Touchdown Realty Group, LLC.

Count IV of the Amended Complaint asks this Court, based upon the record before it, and based upon findings of the jury, that Touchdown Realty Group, LLC is a sham, and is, in fact,

nothing more than an alter ego of Tom Clayton, by which he shelters his assets in his personal name by placing his liabilities in a sham LLC. While the Defendants' recitation in Summary Judgment Motion is mildly entertaining in stating what Count IV is about, the Defendants are wide of the mark. Massachusetts is increasingly moving toward a re-analysis of the corporate shield in these single-manager LLC entities, and an important case came out of the District Court's Appellate Division,  Kosanovich v. 80Worcester Street Asssociates, LLC 2014 Mass.App.Div. 93 (2014) which is compelling for its line of thought and which is attached hereto. Kosanovich involved an LLC in which the LLC's manager and sole member was held personally liable under the theory of alter ego because his conduct reflected a flagrant disregard of corporate formalities which allowed for an analysis of corporate integrity. The holding rested on factual findings of the fact finder, taking this issue outside the realm of Rule 56(c).

In Scott v. NG US 1, Inc., 450 Mass. 760,768 (2008), the Court noted the familiar litany of factors to consider in the alter ego analysis: common ownership, pervasive control, confused intermingling of business assets; thin capitalization; non observance of corporate formalities; absence of corporate records;…use of the corporation for transactions of the dominant shareholders; and *use of the corporation in promoting fraud*." (emphasis in the original). Kosanovich stands for the principle that when there is a whiff of smoke that warrants an investigation into an alter ego relationship, the corporation that has not maintained the records to prove its corporate formality will not be protected from imposition of personal liability as an alter ego. This is the basis of the alter ego claim. In the realm of fraud, there  is a substantial record of deceit by Touchdown with the intention of inducing the Wades to contract with Touchdown. Equally, even though Tom Clayton is not an officer or director or employee or agent of Touchdown, his control is pervasive and exclusive. The document requests and

responses in Exhibit J and F were geared toward these questions: was Touchdown a thinly capitalized entity? Was it being used exclusively to shield liability for fraud by its ownership? Were corporate formalities being observed? Who actually paid for the renovation of 32 Oak Street? Who received the benefit? Who hired the architect, engineer, contractor, subcontractors? Who bought the materials? Who ran the job meetings? Was there construction financing? Was it personally guaranteed?  Who actually directed the work? What work was performed and by whom? All of these questions, which should have easy answers by a real estate developer, were responded to with the common answers that Touchdown had no corporate records for this project. The Plaintiffs in this case have been denied their ability to investigate the issue of corporate responsibility, because the husband of the sole manager, always the visible front-man for the project, couldn't produce any of the records one might expect. In Kosanovich, the Appellate Division noted that "the judge had sufficient evidence to conclude that corporate records did not exist or were not properly kept….The trial judge had sufficient evidence to conclude that Feuerman had pervasive control of the LLC and failed to properly maintain corporate records" and the key issue was "the credibility of the witness" to explain why the records did not exist. At trial, it will be up to Tom and Kelly Clayton to convince a jury by their own credibility that there is good cause for not having records. In the absence of such finding of credibility, this Court has the power to view poor record keeping as a de facto basis for a finding of alter ego responsibility. At this juncture, in the light of the extant fraud, the Court should leave this matter to the jury, and the Motion for Summary Judgment should be DENIED.

   D.  THE DEFENDANTS HAVE FAILED TO DEMONSTRATE AN ENTITLEMENT
       TO SUMMARY JUDGMENT AS TO COUNT V OF THE AMENDED
       COMPLAINT

***"You're wasting time, dude. Are you trying to get answers or do you want to f----g play games?"***

So said Tom Clayton at his deposition when he was asked about whether he had received the 93A demand from the Wades in February of 2017.(Exhibit F, page 161-62)  The Wades' claim under GL c. 93A far exceeds a claim for breach of contract. First and foremost, the claim under GL c. 93A arises out of  940 CMR 3:16 (2). A violation of this statute constitutes a violation of GL c. 93A as a matter of law. The traditional standard of <u>Levings v. Forbes & Wallace, Inc.</u>, 8 Mass.App.Ct. 498,504 (1979), defined an unfair and deceptive trade practice requiring that "objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." Again, the chalks help. In Chalk 1, there is a certain degree of rascality in the exclamation point in the first sentence of Clayton's July 21, 2016 email "I'll gladly explain!" before he proceeds to lie to the Wades' broker. If the concept of deceit and half-truth in the furtherance of selling 32 Oak Street, a veritable trap to a family with a severely disabled child, doesn't raise the eyebrow of someone inured to the rough and tumble of commerce, nothing will. It is also noted parenthetically that the rascality and intimidation factor portrayed by Clayton was not solely seen in his deposition conduct towards the Wades' counsel. At the deposition of Pauline Zajdel, Exhibit A, page 126, Ms. Zajdel was still visibly shaken by Tom Clayton's belligerence and rudeness to her when he was demanding "grandfathering" more than two years after her encounter with him. The 93A claim is based upon the fact that Tom Clayton is a liar and a thug, and that he breached his duties of disclosure as a broker.

Finally, the Defendants' brief misstates the principle of 93A in terms of demand letters. Massachusetts employs the "mail-box rule" for service of demand letters under GL. c. 93A

§9(3), which merely requires that "a written demand for relief…shall be mailed." <u>Smith v.</u>

<u>Jenkins</u>, 732 F3rd 51,74 (1st Cir. 2013)(mailing the 93A demand letter to the corporation or the

likely respondent satisfies the requirement of 93A). Here, Exhibit L shows that the demand

letters were sent specifically to Touchdown at its corporate office, which is also the home of

Tom Clayton. The Wades satisfied their notice obligation under GL c. 93A. The decision by the

Claytons not to collect their mail does not change the fact that the preconditions for a  93A claim

were satisfied when the package went to the post office. The Claytons did not accept their mail at

their own peril. The record abounds with rascality, and there is no basis in law for dismissing

Count V such that the summary judgment motion as to Count V must be DENIED.

    E.  THE COURT SHOULD DISREGARD MOST OF PAGE 13 OF DEFENDANTS'
        BRIEF AS BEING LEGALLY AND FACTUALLY DISTORTED

For some reason, the Defendants spend a segment of page 13 discussing the role of

"expert witnesses," and the discussion is confused. The Defendants make reference to Federal

Rule of Evidence 701, which permits lay witnesses to testify as to their realms of experience,

while then distorting the meaning of the rule. In many ways, the Defendants confuse Rule 701,

which deals with lay witnesses testifying as to their own experiences within their own arcane

fields, and Rule 702, which addresses actual expert witness conduct. The Defendants then state

that because Dennis Schadler is a "carpenter," he can't testify as to building code because he

wasn't designated as an expert witness by the Wades. This is a non-sequitur. Rule 701 and Rule

702 differentiate between lay witnesses who are testifying about their experiences in a particular

context within a case (Rule 701) and those who are "forensic" experts, meaning that they come

in to the case after suit is filed or shortly before to assess issues to which there is no prior

experience. In any event, Dennis Schadler, as is noted in his affidavit, holds a Construction

Supervisors License, and he need not be identified as an expert witness in this case because his

testimony is limited to reporting what he saw when he opened the walls at 32 Oak Street to make improvements for the Wades' disabled daughter. In this case, *everyone* is a lay expert, either in law, real estate brokerage or construction. The notion that everyone would have to be disclosed as an expert is non-sensical. In fact, by Defendants' own logic, since they named no experts, Tom Clayton should be barred from testifying. Plaintiff does not believe the issue is germane now or even appropriate in the context of the Motion for Summary Judgment. The primary case in distinguishing Rule 701 lay experts from Rule 702 forensic experts is <u>US v. Padilla</u>, 657 F.3rd 1085,1102  (2011) in which it was stated that an FBI agent could testify about a topic which "was rationally based on his perception" while being involved in an anti-terrorist operation and that what he had to proffer was admissible testimony as lay expert opinion. The language of "rationally based on his perception" is the mechanism by which one is not converted into a Rule 702 expert witness simply because the knowledge of one's occupation might sound like an expert opinion. A lawyer involved in a case can explain law in a case in which he was involved. A broker can explain an understanding of how a transaction unfolded. Dennis Schadler, with a Construction Supervisor's License, can tell a jury that he opened a wall and saw building code violations. The Defendants' contentions to the contrary are not correct, and would make lawsuits unworkable. The Court should simply reject this section of the brief as both irrelevant and wrong.

IV     <u>CONCLUSION</u>

For the foregoing reasons, that the Wades can demonstrate factual questions of breach of contract, factual questions of breach of duty by a broker (and outright deceit), serious factual questions of alter ego liability and GL c. 93A, the Defendants' Motion for Summary Judgment is without basis, and should be DENIED.

Respectfully Submitted,

**Gregg and Karin Wade**

By their attorney,

  /s/Robert N. Meltzer
Robert N. Meltzer, BBO #564745
Mountain States Law Group
Wheelhouse at the Bradford Mill
33 Bradford Street
Concord, MA 01742
Phone: (978) 254 6289
robmeltzer@aol.com

Dated: March 11, 2019

## CERTIFICATE OF SERVICE

I, Robert N. Meltzer, attorney for the Plaintiffs, hereby certify that I served the foregoing on all counsel of record under the electronic filing system.

                    /s/Robert N. Meltzer
March 11, 2019